AUSA: Adabelle U. Ekechukwu

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JUMAIMA KAMARA,

Defendant.

26 MAG 4353

**SEALED COMPLAINT**

Violation of 18 U.S.C. § 371

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

Felipe Ortiz, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD") and a Task for Officer ("TFO") with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Dispense an Adulterated Device)**

1. From at least in or around April 2026 through at least in or around October 2026, in the Southern District of New York and elsewhere, JUMAIMA KAMARA, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, to wit, with the intent to defraud and mislead, receiving misbranded and adulterated devices, to wit dermal fillers intended for foreign markets, in interstate commerce and delivering and proffering the delivery thereof, such devices being adulterated within the meaning of Title 21, United States Code, Section 351(f)(1)(B), in that they are Class III devices that lack requisite premarket approval from the United States Food and Drug Administration ("FDA"), and such devices being adulterated in that their labeling was false and misleading in any particular within the meaning of Title 21, United States Code, Section 352(a)(1), in violation of Title 21, United States Code, Sections 331(c) and 333(a)(2).

2. It was a part and object of the conspiracy that JUMAIMA KAMARA, the defendant, and others known and unknown, would and did intentionally and knowingly receive misbranded and adulterated devices, to wit, dermal filler products that have not received requisite premarket approval from the FDA, and in the course of such conduct would, with the intent to defraud and mislead, introduce, ship, transport, and receive adulterated devices in interstate and foreign commerce, in violation of Title 21, United States Code, Sections 331(c) and 333(a)(2).

Overt Act

3. On or about October 15, 2026, in New York, New York, JUMAIMA KAMARA, the defendant, possessed with the intent to distribute at least approximately 100 adulterated devices, *i.e.*, dermal filler products that were manufactured outside of the United States and have not received premarket approval from the FDA.

(Title 18, United States Code, Section 371)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Detective with the NYPD and a TFO with HSI. I have served as an NYPD Detective for approximately 21 years and as a TFO with HSI for approximately five years. I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports, records, and surveillance footage, my conversation with the defendant, and my communications with other law enforcement officers. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**The Federal Food, Drug, and Cosmetic Act ("FDCA") and Adulterated Devices**

5. The Food and Drug Administration ("FDA") is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"). Among the purposes of the FDCA is to ensure that devices intended for human use are safe, effective, and bear labeling containing accurate information. Based on my communications with FDA agents who are involved in the investigation of this matter and my understanding of the FDCA from those communications and my training, experience, and research, and, in particular, the charged offense, I am aware, among other things, that:

a. Under the FDCA, a "device" is, in relevant part, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or . . . intended to affect the structure or any function of the body of man or other animals."[1] 21 U.S.C. § 321(h).

b. The FDA classifies devices into one of three regulatory classes – Class I, II, or III. A major factor for determining classification is the risk the device poses to the patient or the user. Class III devices are generally subject to the most stringent regulatory controls. Devices that were first introduced or delivered for introduction into interstate commerce for commercial distribution after May 28, 1976, are automatically classified into Class III as a matter of law. *See* 21 U.S.C. §§ 360c(f)(1) and 360e(a).[2]

---

[1] An article is not a medical device if it achieves its primary intended purposes through chemical action within or on the body of man or other animals or is dependent upon being metabolized for the achievement of its primary intended purposes. *See* 21 U.S.C. § 321(h).

[2] Generally, Class III devices cannot be lawfully shipped in interstate commerce without premarket approval ("PMA"). PMA is the required process of scientific review and evaluation of data and specifications to ensure the safety and effectiveness of Class III devices. *See* 21 U.S.C. § 360e and 21 C.F.R. Part 812. However, the FDCA provides an "investigational device exemption" ("IDE") from the general rule to allow a device to be shipped such that investigators can test the device on human subjects. *See* 21 U.S.C. § 360j(g). Additionally, Class III devices can be reclassified into Class I or II by the written order of FDA (*see* 21 C.F.R. Part 860, Subpart C-Reclassification) or

c. A device is misbranded if, among other things, its labeling is false or misleading in any particular. *See* 21 U.S.C. § 352(a)(1). A device is adulterated if, among other things, it is a Class III device pursuant to 21 U.S.C. § 360c(f), is required under 21 U.S.C. § 360e(a) to have in effect an approved application for premarket approval ("PMA"), is not exempt from 21 U.S.C. § 360e under 21 U.S.C. § 360j(g) and does not have a PMA in effect. *See* 21 U.S.C § 351(f)(1)(B).

d. Dermal fillers, also known as injectable implants, soft tissue fillers, lip and facial fillers, or wrinkle fillers are medical device implants that may be intended to create a smoother and/or fuller appearance in the face, cheeks, chin, lips, and back of the hands. Hyaluronic acid is an absorbable material that is used in dermal fillers with effects that last approximately 6 to 12 months. As with any medical procedure, there are risks involved with the use of dermal fillers, including swelling, bruising, and pain, and less common risks such as inflammation, infection, tissue death, and accidental injection into a blood vessel.

e. One such hyaluronic acid dermal filler Class III device that is not exempt from approval is marketed as "e.p.t.q." and does not have in effect an approved PMA, and therefore is a device that is adulterated within the meaning of 21 U.S.C. § 351(f)(1)(B). Based on products reviewed during this investigation and through internet research, e.p.t.q. is marketed by Jetema, a South Korean firm.

f. Revolax Fine, Revolax Deep, and Revolax Sub Q are dermal fillers and Class III devices that are not exempt from approval, do not currently have in effect approved PMAs, and therefore are devices that are adulterated within the meaning of 21 U.S.C. § 351(f)(1)(B). Based on products reviewed during this investigation and through internet research, these Revolax devices are marketed by Across Co., Ltd. (South Korea) as injectable hyaluronic acid fillers that are medical devices used for wrinkle improvement and tissue restoration.

**KAMARA's Receipt and Possession of Adulterated Devices**

6. Based on my participation in this investigation, including my review of surveillance footage, my conversations with an undercover officer ("UC-1") and other law enforcement officers, my participation in the post-arrest interview of JUMAIMA KAMARA, the defendant, and my review of law enforcement reports and records, including those containing witness statements, I have learned, among other things, the following:

a. Since approximately 2024, Klashed Aesthetics, an aesthetics clinic based in the United Kingdom, has advertised online that it offers dermal fillers and other cosmetic services in the United States, including in New York City. The clinic's advertisements, including those on a particular social media platform ("Social Media Platform-1"), generally include information about where and when the service will be provided, as well as representations that the service will be performed by a nurse practitioner.

b. JUMAIMA KAMARA, the defendant, is the CEO and founder of Klashed Aesthetics, and is depicted below in an image obtained from Klashed Aesthetics' website and

---

by a determination by FDA finding the device to be substantially equivalent to a legally marketed predicate device (referred to as "FDA clearance" or "510(k) clearance"). *See* 21 U.S.C. § 360c(i).

social media advertisements holding what appears to be a syringe and dressed in black scrubs and black medical gloves (**Image 1**). Although certain of Klashed Aesthetics' social media posts indicate that KAMARA performs dermal filler injections in the United States, KAMARA is currently in the United States on an expired visa and does not have a medical practitioner's license in New York.



**Image 1**

c. In or around September 2026, UC-1, posing as a customer seeking a dermal filler, contacted Klashed Aesthetics via Social Media Platform-1. The user of Klashed Aesthetics' social media account—who I believe is either KAMARA or a co-conspirator working with KAMARA ("CC-1")—responded to UC-1's inquiry and informed UC-1 that the dermal filler appointment would take place at a particular location in Manhattan, New York ("Store-1"). During their communications, they discussed, in sum and substance, the time to meet to conduct the dermal filler appointment, the price, and the kind of dermal filler that would be used.

d. On or about October 14, 2026, the Honorable Robyn F. Tarnofsky, United States Magistrate Judge for the Southern District of New York, issued a search warrant to search, among other things, Store-1 and KAMARA.

e. On or about the morning of October 15, 2026, as other law enforcement officers and I were prepared to execute the warrant of Store-1, a law enforcement officer observed KAMARA approach Store-1 wearing a black shirt and black pants and carrying a pink roller bag (the "Bag"), as circled in red below in **Image 2** and **Image 3**.[3]

[3] According the Klashed Aesthetics' advertisements on Social Media Platform-1 and their communications with UC-1, Klashed Aesthetics was scheduled to offer its dermal filler services and other cosmetic services at Store-1 on or about October 15, 2026.




**Image 2**



**Image 3**

f. Upon executing the Store-1 warrant, during which agents located KAMARA and the Bag inside Store-1, agents searched the Bag and observed over approximately 100 boxes containing products manufactured by Revolax (the "October 15 Revolax Devices"), depicted below in **Image 4** and **Image 5**. Based on the training and experience of the examining agent, and as confirmed later by law enforcements agents at the FDA, the October 15 Revolax

Devices appeared to be dermal filler products that were not manufactured in the United States, have not received premarket approval by the FDA, and were therefore adulterated devices.[4]




**Image 4**




**Image 5**

g. Upon discovering the October 15 Revolax Devices inside the Bag, law enforcement agents placed KAMARA under arrest. After her arrest, KAMARA was informed of her *Miranda* rights, which she waived, and agreed to speak to law enforcement.

h. During the subsequent interview, KAMARA told other members of law enforcement and me, in substance and in part, that: (i) she is the owner of Klashed Aesthetics and the company provides dermal filler procedures; (ii) the October 15 Revolax Devices were a mixture of products she received from prior shipments and deliveries while in New York and other products she received and transported from outside of New York; (iii) her assistant orders the dermal filler products from particular distributors located in New York and California; and (iv) at the time the premises warrant was executed on or about October 15, 2026, KAMARA was in the process of applying lidocaine, which is a numbing medication, to the face of a particular patient who was present in Store-1.[5]

i. Based on my conversations with other law enforcement officers and my review of reports and records from their investigation, I have learned that since approximately 2026, on at least three other occasions, KAMARA has received suspicious packages containing

---

[4] Specially, the Bag contained approximately 24 boxes labeled "Revolax Fine with Lidocaine," approximately 71 boxes labeled "Revolax Deep with Lidocaine," and approximately 35 boxes labeled "Revolax Sub Q with Lidocaine."

[5] During the post-arrest interview, KAMARA claimed that she is a certified medical assistant in the United States who is allowed to assist while medical procedures are conducted. After making the statements described herein, KAMARA requested counsel and the post-arrest interview ceased.

adulterated devices (*i.e.*, dermal fillers) that are similar to the October 15 Revolax Devices. More specifically:

i. On or about April 15, 2026, officers from the United States Customs and Border Protection ("CBP") seized a package (the "April 15 Package") that was addressed to KAMARA at a particular address located in North Carolina and had been shipped from a particular individual in South Korea ("CC-2"). The April 15 Package, which was manifested and described on the commercial invoice as "SKIN CARE SERUM AMPOULE SAMPLE," contained approximately 100 boxes of e.p.t.q. S 500 Lidocaine.

ii. On or about April 27, 2026, CBP officers seized a package (the "April 27 Package") that was addressed to KAMARA at a second particular address located in North Carolina and had been shipped from South Korea from CC-2. The April 27 Package, which was manifested and described on the commercial invoice as "SKIN CARE SERUM AMPOULE SAMPLE," contained approximately 100 boxes of e.p.t.q. S 500 Lidocaine.

iii. On or about June 18, 2026, CBP officers seized a package (the "June 18 Package") that was shipped from South Korea from CC-2 to a particular address in New York, New York ("Apartment-1"). Although the June 18 Package was addressed to another individual, I believe KAMARA was the intended recipient because KAMARA's phone number was listed as the intended recipient's phone number, and staff from the building where Apartment-1 is located informed law enforcement that KAMARA rented Apartment-1 during the period when the June 18 Package was scheduled to arrive there.

iv. The June 18 Package, which was manifested and described on the commercial invoices as "SKIN CARE SERUM AMPOULE SAMPLE," contained approximately 20 boxes of Revolax FINE with Lidocaine, approximately 65 boxes of Revolax Sub-Q with Lidocaine, and approximately 65 boxes of e.p.t.q. S 500 Lidocaine, depicted below in **Image 6** and **Image 7**:



**Image 6**




**Image 7**

WHEREFORE, I respectfully request that JUMAIMA KAMARA, the defendant, be imprisoned or bailed, as the case may be.

TFO Det. [signature]
Felipe Ortiz
Task Force Officer, Department of Homeland Security,
Homeland Security Investigations
Detective, New York City Police Department

Sworn to before me this 16th day of October, 2026.

[signature]
THE HONORABLE ROBYN F. TARNOFSKY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK